**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Lead Civil Action No. 1:24-cv-03259-DDD-NRN

*Consolidated with* 1:24-cv-03261-SBP;
1:24-cv-03262-SBP; 1:24-cv-03509-NRN; and
1:25-cv-00075-KAS

OLGA MARGUL, KELLI JO CLAXTON,
HENRY YEH, COLIN SMITH, ROD
GENDRON, KAYLA MORRIS, TIMOTHY
MILLER, DAWN SAQUIN, IMENE HADDAD,
DANIEL BREWER, PAUL TONNER, CORY
ESPINOLA, STEPHANIE IZQUIETA,
KATHERINE MAUL, RICHARD TODD HALE,
AND ALFRED ROTIMI, individually and on
behalf of all similarly situated persons,

Plaintiffs,

v.

EVOLVE BANK & TRUST, an Arkansas bank;
AMG NATIONAL TRUST BANK, a Colorado
bank; LINEAGE BANK, a Tennessee bank,

Defendants.

---

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
JURY TRIAL DEMANDED**

---

Plaintiffs Olga Margul, Kelli Jo Claxton, Henry Yeh, Colin Smith, Rod Gendron, Kayla Morris, Timothy Miller, Dawn Saquin, Imene Haddad, Daniel Brewer, Paul Tonner, Cory Espinola, Stephanie Izquieta, Katherine Maul, Richard Todd Hale, and Alfred Rotimi ("Plaintiffs") bring this consolidated class action complaint on behalf of themselves and all others similarly situated against AMG National Trust Bank, a national bank ("AMG"), Evolve Bank & Trust, an Arkansas bank ("Evolve"), and Lineage Bank, a Tennessee bank ("Lineage") (collectively, the "Banks" or "Defendants"). The allegations contained in this consolidated class action complaint are based on Plaintiffs' personal knowledge of facts pertaining to themselves and upon information and belief, including further investigation conducted by Plaintiffs' counsel, as to the remainder.

## I.      NATURE OF THE ACTION

1.      This action arises from the negligent monitoring and mismanagement of funds belonging to Plaintiffs and Class Members who entrusted cash deposits to one or more of the Defendants via use of various financial technology platforms ("FinTechs").

2.      FinTechs are a growing sector of technology-based investing, money management, and wealth accumulation platforms, but are not themselves banks – meaning they cannot maintain custody of customer funds. Customer funds have to be maintained at actual banks, like Defendants.

3.      In this case, FinTechs used Defendants for their banking services, and Defendants in turn used a third-party company named Synapse Financial Technologies, Inc. ("Synapse") to open accounts, process transactions, and manage account statements and ledgers for any FinTech companies working with them, and ultimately for their end users.

4.      Defendants' use of Synapse and failure to adequately monitor and safeguard Plaintiffs' and Class Members' funds in their control led to significant ledger discrepancies in

account balances. These irregularities were materially inaccurate and, as a result, could not be used as the basis for distributing funds to the end users.

5.    As a result of Defendants' acts and omissions, Plaintiffs and Class Members had their funds lost, stolen, or misplaced, while no single Defendant took responsibility for their failures. Further, Defendants have refused to return funds to these end users, leaving thousands of customers, like Plaintiffs and Class Members, without access to their funds.

## II.    PARTIES

6.    Plaintiff Olga Margul is a resident of the State of Massachusetts. She was present in Massachusetts at the time she signed up for an account with the FinTech Juno and deposited funds. On May 15, 2025, Plaintiff Margul attempted to withdraw her funds. $1,049 was actually transferred to Liberty Federal Credit Union from Juno, but the transfer was cancelled, and the funds were clawed back to Juno on May 22, 2024. Plaintiff Margul was charged a transfer fee of $27.00 that was later refunded. At the time Plaintiff requested the withdrawal, her account balance showed $1,050.00. Months Later, Plaintiff Margul was offered $0.00 in reconciliation. Plaintiff appealed that offer and the appeal was rejected.

7.    Plaintiff Kelli Jo Claxton is a resident of the State of California. She was present in California at the time she signed up for an account with the FinTech Yotta and deposited funds. On May 10, 2024, Plaintiff Claxton attempted to withdraw her funds but was limited to a daily limit withdrawal of $10,000. On May 10th, 11th, 13th and 15th, she attempted to withdraw another $10,000 and all four withdrawals were cancelled. At the time she requested the withdrawal, her account balance showed $83,568.83. Months later, Plaintiff Claxton received $2,034.93 in reconciliation.

3

8.      Plaintiff Henry Yeh is a resident of the State of California. He was present in California at the time he signed up for an account with the FinTech Yotta and deposited funds. Plaintiff Yeh first attempted to withdraw his funds after he received the notice letter from Evolve in November 2024. To date, every withdrawal that Plaintiff Yeh attempted was cancelled. At the time he requested the withdrawal, his account balance showed $2,656.84. Plaintiff Yeh received $2.43 in reconciliation.

9.      Plaintiff Colin Smith is a resident of the State of Michigan. He was present in Michigan at the time he signed up for an account with the FinTech Yotta and deposited funds. On May 13, 2024, Plaintiff Smith attempted to withdraw $1,000 of his funds and his withdrawal was cancelled. At the time he requested the withdrawal, his account balanced showed $85,766.29. Months later, Plaintiff Smith was offered $0.00 in reconciliation. Plaintiff appealed that offer and the appeal was rejected.

10.     Plaintiff Rod Gendron is a resident of the State of Indiana. He was present in Indiana at the time he signed up for an account with the FinTech Juno and deposited funds. After Plaintiff Gendron noticed that his monthly interest rate fell sharply, he began transferring his money out of his Juno account but was only able to withdraw $15,000 between April 13, 2024 and May 8, 2024, before his access was cancelled. At the time of Plaintiff Gendron's first transfer, his Juno account balance showed $43,508.54. To date, Plaintiff Gendron has not been offered any money in reconciliation.

11.     Plaintiff Kayla Morris is a resident of the State of Arizona. She was present in Arizona at the time she signed up for an account with the FinTech Yotta and deposited funds. Between May 10, 2024, and May 13, 2024, Plaintiff Morris attempted to withdraw her funds seven

times and all seven were cancelled. At the time she requested the withdrawals, Plaintiff Morris'

balance showed $292,154.41. Months later, Plaintiff Morris received $579.08 in reconciliation.

Additionally, Plaintiff Morris recently received an IRS Form 1099 for $800 in interest that she

earned in 2024 though Yotta.

12.    Plaintiff Timothy Miller is a resident of the State of Maryland. He was present in

Maryland at the time he signed up for an account with the FinTech Yotta and deposited funds.

Plaintiff Miller attempted to withdraw his funds from Yotta in or around May 2024 and was unable

to do so. At the time of the requested withdrawal, Plaintiff Miller's balance showed $34,154.97.

Months later, Plaintiff Miller received $11,936.98 in reconciliation.

13.    Plaintiff Dawn Saquin is a resident of the State of Washington. She was present in

Washington at the time she signed up for an account with the FinTech Juno and deposited funds.

Plaintiff Saquin attempted to withdraw her funds from her Juno account but was unable to do so.

At the time of Plaintiff Saquin's withdrawal attempt, her balance showed $15,310.63. Later,

Plaintiff Saquin received $38.43 in reconciliation.

14.    Plaintiff Imene Haddad is a resident of the State of Florida. She was present in

Florida at the time she signed up for an account with the Fintech Juno and deposited funds. Plaintiff

Haddad attempted to transfer her funds out of her Juno account but was unable to because a hold

was placed on her account. At the time of her request, Plaintiff Haddad's balance showed around

$26,000. Plaintiff Haddad later received around $15,000 in reconciliation.

15.    Plaintiff Daniel Brewer is a resident of the State of Utah. He was present in Utah at

the time he signed up for an account with the FinTech Yotta and deposited funds. Plaintiff Brewer

attempted to withdraw funds about four times, but each withdrawal was cancelled. Plaintiff Brewer

eventually received an email stating that his account was put on hold. At the time he requested the withdrawals, Plaintiff Brewer's balance showed $10,653.40. Plaintiff Brewer was later offered around $0.71 in reconciliation.

16.    Plaintiff Paul Tonner is a resident and citizen of the State of Illinois. He was present in Illinois at the time he signed up for an account with the FinTech Yotta on January 5, 2021, and deposited funds. Plaintiff Tonner attempted to withdraw his funds from Yotta on May 9, 2024, and his withdrawal was cancelled. At the time he requested the withdrawal, Plaintiff Tonner's balance showed $1,543.55. Months later, Plaintiff Tonner received $0.04 in reconciliation.

17.    Plaintiff Cory Espinola is a resident of the State of New York. She was present in New York at the time she signed up for an account with the FinTech Juno and deposited funds. Plaintiff Espinola did not attempt to withdraw funds because his account was frozen when he discovered the problems with his deposit. At that time, Plaintiff Espinola had around $34,000 in his account. Plaintiff Espinola was not offered any money in reconciliation.

18.    Plaintiff Stephanie Izquieta is a resident of the State of New York. She was present in New York at the time she signed up for an account with the FinTech Juno and deposited funds. Plaintiff Izquieta's balance showed $26,889.60. Months later, Plaintiff Izquieta was offered $133.00 in reconciliation.

19.    Plaintiff Katherine Maul is a resident of the State of Missouri. She was present in the state of Missouri at the time she signed up for an account with the FinTech Yotta and deposited funds. Plaintiff Maul attempted to withdraw her funds from Yotta on May 28, 2024, and her withdrawal was cancelled. At the time she requested the withdrawal, Plaintiff Maul's balance showed $22,000. Months later, Plaintiff Maul received $0.42 in reconciliation.

6

20.     Plaintiff Richard Todd Hale is a resident of the State of Oklahoma. He was present in Austin, Texas at the time he signed up for an account with the FinTech Mainvest Inc. and deposited funds. On March 24, 2025, Lineage sent an email to Plaintiff Hale that included a link to an electronic payment for a sum less than his balance held by Mainvest, Inc. Plaintiff Hale's deposited balance with Mainvest, Inc. was approximately $300.00. Lineage offered Plaintiff Hale $12.41 in reconciliation. Plaintiff Hale was asked by Lineage to sign a release to receive the funds, but Plaintiff Hale did not sign the release and did not accept the funds.

21.     Plaintiff Alfred Rotimi is a resident of the State of Maryland. He was present in Maryland at the time he signed up for an account with the FinTech Mainvest, Inc. to raise funds for his company Joyhound Beer Company, LLC. On November 8, 2024, Lineage sent an email to Plaintiff Rotimi that included a link to an electronic payment for a sum less than his balance held by Mainvest, Inc. Plaintiff Hale's balance with Mainvest, Inc. was $126,500. Lineage offered Plaintiff Hale $125,980 in reconciliation. Plaintiff was asked by Lineage to sign a release to receive the funds, but Plaintiff Hale did not sign the release, but he did receive $125,980.

22.     Defendant AMG National Trust Bank is a bank chartered under the laws of the United States, whose corporate headquarters and principal place of business is located at 1155 Canyon Boulevard, Suite 310, Boulder, Colorado 80302.

23.     Defendant Evolve Bank & Trust is a bank chartered under the laws of Arkansas with twenty-six locations in ten states. Its corporate headquarters and principal place of business is located at 301 Shoppingway Boulevard, West Memphis, Arkansas 72301.

24.     Defendant Lineage Bank is a bank chartered under the laws of Tennessee whose corporate headquarters and principal place of business is located at 3359 Aspen Grove Drive, Franklin, Tennessee 37067.

## III.    JURISDICTION AND VENUE

25.     This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (i) there are at least 100 class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one putative class member and one Defendant are citizens of different states.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims herein occurred in this judicial district.

27.     Further, as set forth herein, Defendants have contacts in this district sufficient to subject them to the personal jurisdiction of this district as if this district were a separate state. Upon information and belief, Defendants transacted with consumers in this district. Upon information and belief, Defendants continuously and systematically offered banking services to consumers in this District, maintained an interactive commercial service through the FinTechs at issue, and allowed customers in this District to transact with Defendants. Upon information and belief, Defendants all conduct substantial business in this District and a substantial part of the acts and omissions complained of occurred in this District. Upon information and belief, each Defendant has a physical presence in Colorado, offers banking services in Colorado, and/or transacts with customers physically present in Colorado. Additionally, AMG has its principal place of business in Colorado.

28.     Exercising jurisdiction over Defendants is fair, just, and reasonable considering the quality and nature of Defendants' acts that occur in Colorado and which affect interests located in Colorado. Upon information and belief, Defendants have purposefully availed themselves of the privilege of conducting activities in Colorado and should reasonably anticipate being hauled into court in Colorado.

## IV.     GENERAL ALLEGATIONS

### Fintech Platforms and Financial Accounts

29.     Companies colloquially described as "FinTechs" are financial technology businesses that offer software with the goal of helping individuals manage their finances. Most FinTechs offer web- and mobile application-based solutions as alternatives to traditional banks.

30.     Because the FinTechs at issue are not themselves banks, they could not accept and retain customer deposits. Rather, the FinTechs partnered with Defendants who, in turn, maintained custody of customers' funds. In other words, the FinTechs allowed their customers (i.e., ordinary members of the public) to deposit cash into Defendants through the FinTechs' online platforms, mediated by Synapse, and Defendants maintained custody of these funds.

31.     Like any banking customer, FinTech users reasonably believed their funds were being held at Defendants in a safe and secure manner and were available to access and withdraw on demand. FinTech users also reasonably believed their account balances (the dollar figure shown to users on the FinTech platforms) were accurate.

### Synapse Financial Technologies, Inc. Collapses

32.     Synapse was founded in 2014. Synapse touted itself as the pioneer of the banking-as-a-service ("BaaS") model. It functioned as a middleman between traditional banks and

9

FinTechs. In this role, Synapse opened deposit accounts on behalf of approximately 100 FinTech companies and their end users at four different banks—Evolve, American Bank, AMG, and Lineage—and Synapse managed the account ledgers.

33.     More specifically, beginning in 2014, Synapse opened Demand Deposit Accounts ("DDAs") on behalf of approximately 100 FinTechs and their end users at Defendants.

34.     Beginning in 2020, Synapse developed its cash management program in connection with its subsidiary, Synapse Brokerage LLC ("Synapse Brokerage"), through which Synapse began opening Cash Management Accounts ("CMA Accounts") on behalf of the FinTechs and their end users at Defendants.

35.     Most end user funds were held in omnibus "For Benefit Of" Accounts ("FBO Accounts")[1] and the remaining funds are held in DDAs across the Partner Banks.

36.     In doing so, Synapse combined data received from Partner Banks with its own customer transaction data and delivered that data to the FinTechs. This meant that FinTech users relied on the FinTechs and Partner Banks to account for users' funds; and the FinTechs and Partner Banks, in turn, relied in part on Synapse to keep track of users' funds.

37.     On April 22, 2024, Synapse filed for Chapter 11 bankruptcy in the Central District of California. After the bankruptcy filing, it came to light that approximately *$85 million* in customer funds across *100,000 customers* had gone missing.

38.     The bankruptcy process has revealed significant failings, including that Synapse and Defendants did not maintain accurate ledgers, leading to incorrect customer fund balances. As

---

[1] A "For Benefit Of" or "FBO" account is a type of custodial account. It is a pooled account that allows a company to manage funds on behalf of, or "for the benefit of," one or more of their users without assuming legal ownership of that account.

a result, many customers have been left unable to access funds held at Defendants and unable to pay essential bills or living expenses.

**Defendants Have Not Returned All Customer Funds**

39.     Following Synapse's collapse, Defendants allegedly began reconciling customers' funds and working to correct the materially inaccurate ledgers. Despite these purported efforts, the Partner Banks have not accounted for and returned all deposits belonging to FinTech users. Instead, Defendants are (1) blaming each other for the inability to unwind Synapse's ledger and fully reconcile missing user funds, and/or (2) asserting that all funds maintained at those Partner Banks have been distributed.

40.     For example, according to Synapse's bankruptcy filings from November 2024, Evolve reported publicly that it concluded its reconciliation efforts as of October 18, 2024. Evolve also reported that it would begin notifying end users of funds held and making distributions on November 4, 2024. According to the bankruptcy Trustee's direct communications from end users and publicly available information, Evolve notified many end users that it holds funds for those end users in amounts considerably *less* than shown on the Synapse ledger. As a result, Evolve will distribute considerately less to such end users, and Evolve asserts that the missing funds are in the custody of other Partner Banks.

41.     AMG and Lineage, on the other hand, dispute the accuracy of Evolve's reconciliation. For example, in a public letter dated November 12, 2024, these two banks contend that "calculating specific end user balances by bank was impossible because Synapse often directed large bulk bank-to-bank transfers of funds that bore no relationship whatsoever to specific individual end users or their transactions." AMG and Lineage also denied that they hold

11

"substantial additional funds" belonging to fintech users, instead claiming that they already distributed over 99% and 90%, respectively, of funds owed to FinTech users.

42.     The result is that many customers are left without access to their cash deposits and with no clear ability to discern which of the Defendants holds their money, but their money is necessarily held by one or more of the Defendants.

**The Failure to Maintain, Account, and Provide Access to Customer Funds Confirms Material Risk Management Failures**

43.     Defendants' inability to track and provide immediate access to customer funds is indicative of material risk management failures.

44.     For example, Evolve was issued a cease-and-desist order by the Federal Reserve on June 14, 2024, two months after the Synapse bankruptcy filing.[2] This order stemmed from an examination of Evolve conducted in early 2023. Therefore, Evolve Bank must have been aware of significant operational and compliance issues for at least one-year preceding Synapse's bankruptcy filing.

45.     Similarly, Lineage Bank entered a Consent Order with the FDIC on January 30, 2024, four months before the Synapse bankruptcy filing.[3] Although this consent order did not

---

[2] Cease & Desist Order Issued Upon Consent, *In re Evolve Bancorp*, Docket Nos. 24-012-B-HC, 24-012-B-SM, (FRS June 7, 2024),
https://www.federalreserve.gov/newsevents/pressreleases/files/ enf20240614a1.pdf (last visited Dec. 18, 2024). *See also* FRS, *Federal Reserve Board issues an enforcement action against Evolve Bancorp, Inc. and Evolve Bank & Trust for deficiencies in the bank's anti-money laundering, risk management, and consumer compliance programs*, 2024 WLNR 9413232, (June 14, 2024), and available at:
https://www.federalreserve.gov/newsevents/pressreleases/enforcement 20240614a.htm (last visited Dec. 18, 2024).
[3] Consent Order, *In the Matter of Lineage Bank, Franklin, Tennessee, (Insured State Nonmember Bank)*, FDIC-23-0041b (Jan. 30, 2024),

specify the timing of an earlier exam, the level of detail and breadth of issues contained in the consent order also suggest that significant compliance issues existed and must have been known by Lineage Bank well before Synapse's bankruptcy filing.

46.     Banks are expected to maintain contingency and business continuity plans that address the potential failure of critical third parties. Synapse was clearly such a critical third party, and yet none of the Defendants had a plan in place for what to do in the event of operational issues at Synapse—let alone failure.

47.     Defendants' lack of direct bank access to Synapse's ledger, lack of contingency planning, and failure to maintain their own copy of the ledger all contributed to their respective failures to fulfill the most fundamental responsibility in banking: to keep track of the money.

48.     The fact that the failure of a startup technology provider left several banks unable to process accounts worth over $250 million, and that millions of dollars remain frozen more than four months later (with, upon information and belief, many millions unaccounted for) means those banks had major lapses in their risk management.

49.     Had Defendants pushed sooner or more forcibly for detailed reconciliations or greater access to Synapse's systems, the Partner Banks would have recognized the scope of the problem. Defendants also could have remedied the problem without freezing users out of access to their funds.

50.     Plaintiffs and Class Members, through their accounts with various FinTechs, deposited money into Defendants which they have been unable to access for months.

---

https://orders.fdic.gov/sfc/servlet.shepherd/document/download/0693d 00000BrElHAAV?operationContext=S1 (last visited Dec. 18, 2024).

51.     Moreover, Plaintiffs and Class Members have now been offered only a small percentage of the funds they deposited with Defendants through the FinTechs back.

52.     Upon information and belief, Plaintiffs' and Class Members' remaining funds are still in Defendants' hands and Defendants are acting so as to keep said funds despite those funds belonging Plaintiffs and Class Members.

## V.     CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this action on behalf of themselves, and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seek certification of the following class:

> **All persons residing in the United States who have been denied access to their funds held by Evolve Bank and Trust, AMG National Trust, or Lineage Bank, beginning April 22, 2024.**

54.     The nationwide Class is collectively referred to as the "Class" and "Class Members." Excluded from the Class are the Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendants have or had a controlling interest.

55.     Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

56.     **Numerosity.** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to

Plaintiffs at this time and can only be ascertained through appropriate discovery, but upon information and belief, Plaintiffs allege that there are in excess of 1,000 members of the Class.

57. **Typicality.** Plaintiffs' claims are typical of those of other members of the Class, all of whom have suffered similar harm due to Defendants' course of conduct as described herein.

58. **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs have retained attorneys who are experienced in the handling of complex litigation and class actions, and Plaintiffs and their counsel intend to diligently prosecute this action.

59. **Existence and Predominance of Common Questions of Law or Fact.** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class, include, but are not limited to, the following:

a. Whether Defendants held funds belonging to members of the Class.

b. Whether Defendants were obligated to return funds to members of the Class.

c. Whether Defendants converted and/or refused to return funds belonging to members of the Class.

d. Whether Defendants failed to adequately track, safeguard, and maintain funds belonging to members of the Class.

e. Whether Plaintiffs and the Class have sustained damages.

f. Whether Plaintiffs and the Class are entitled to restitution.

g. Whether injunctive relief is appropriate and necessary.

15

h. Whether Defendants' conduct was undertaken with conscious disregard of the rights of the members of the Class and was done with fraud, oppression, and/or malice.

60. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual class member to file an individual lawsuit would unreasonably consume the amounts that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiffs anticipate no difficulty in the management of this action as a class action. The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

///

///

///

## VI.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### MONEY HAD AND RECEIVED
**(Against all Defendants)**

61.     Plaintiffs restate the preceding allegations as if set forth herein.

62.     Plaintiffs and the Class each registered accounts on one or more FinTech platforms that contracted with and utilized Synapse's services.

63.     Plaintiffs and the Class each deposited funds at one or more of Defendants through the FinTech platforms.

64.     Defendants had in their possession funds belonging to Plaintiffs and the Class. Plaintiffs and the Class are the owners, and entitled to possession, of their respective funds deposited at Defendants.

65.     Defendants have not returned the funds belonging to Plaintiffs and the Class in full.

66.     Defendants have refused access to the funds belonging to Plaintiffs and the Class.

67.     Accordingly, as more fully set forth above, Defendants had in their possession money which in equity and good conscience belongs to Plaintiffs and Class Members. That money should be refunded to Plaintiffs and Class Members.

### SECOND CAUSE OF ACTION
### UNJUST ENRICHMENT
**(Against all Defendants)**

68.     Plaintiffs restate the preceding allegations as if set forth herein.

69.     Plaintiffs and the Class each registered accounts on one or more FinTech platforms that contracted with and utilized Synapse's services.

17

70.     Plaintiffs and the Class each deposited funds at one or more of Defendants through the FinTech platforms.

71.     Defendants had in their possession funds belonging to Plaintiffs and the Class.

72.     Defendants have not returned the funds belonging to Plaintiffs and the Class in full.

73.     Defendants have been unjustly enriched in retraining the cash deposits belonging to Plaintiffs and the Class.

74.     Defendants have also been unjustly enriched by accruing interest and deriving profits from the unauthorized use of Plaintiffs' and the Class's funds.

75.     Defendants' retention of this money under the circumstances is unjust and inequitable.

76.     As a direct and proximate result of Defendants' misconduct, Plaintiffs and the Class are entitled to restitution and disgorgement in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE**
**(Against all Defendants)**

77.     Plaintiffs restate the preceding allegations as if set forth herein.

78.     Plaintiffs and Defendants have a special relationship that gives rise to Defendants' duties to Plaintiffs and Class Members to act reasonably to (a) hold cash deposits for Plaintiffs' and the Class's benefit; (b) allow Plaintiffs and the Class to access their cash deposits on demand and/or with reasonable notice; (c) protect Plaintiffs and the Class from unreasonable interference with their right and ability to access their funds; and (d) employ commercially adequate practices and procedures regarding the accounting and tracking of such funds.

79.     Defendants each breached their duty to Plaintiffs and the Class by failing to maintain and hold cash deposits, failing to accurately account for cash deposits, and denying access to cash deposits without cause.

80.     The harms inflicted upon Plaintiffs and Class members were reasonably foreseeable. Defendants were aware that consumers relied upon financial institutions to store and safeguard cash deposits and provide prompt access to cash deposits.

81.     Defendants were also aware that the failure to provide access to cash deposits was likely to result in harm above and beyond the amount of the account balance, including the inability to satisfy other debts and pay for necessities of life.

82.      As a direct and proximate result of Defendants' failures described herein, Plaintiffs and the Class have been deprived of their cash deposits, access to cash deposits, accrued interest thereon.

83.     Plaintiffs and the Class have also suffered emotional distress, anxiety, and fear upon being notified that their accounts were frozen and cash balances inaccessible and/or misplaced.

84.     Plaintiffs, on behalf of themselves and the Class, seek damages and interest thereon in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### CONVERSION
### (Against all Defendants)

85.     Plaintiffs restate the preceding allegations as if set forth herein.

86.     Plaintiffs and the Class deposited funds with Defendants.

87.     Plaintiffs and the Class owned and had a right to possess the cash funds deposited with Defendants.

19

88.     Plaintiffs and the Class, through the "reconciliation process" that has occurred as a result of the Synapse bankruptcy, among other avenues, demanded the return of their cash funds deposited with Defendants.

89.     Defendants wrongfully refused to return the property deposited by Plaintiffs and the Class upon proper demand. Defendants have refused to return, lost, or wrongfully disposed of the property deposited by Plaintiffs and the Class.

90.     Plaintiffs and the Class did not consent to the misconduct described herein.

91.     Defendants' misconduct injured Plaintiffs and the Class.

92.     The converted funds are specifically identifiable and in a fixed amount.

93.     As a result of the foregoing actions of Defendants, Plaintiffs and the Class have been damaged in an amount to be proven at trial. Plaintiffs seek all available remedies including general damages, special damages, punitive damages, injunctive relief, attorneys' fees, and costs.

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(Against all Defendants)**

94.     Plaintiffs restate the preceding allegations as if set forth herein.

95.     As the custodian of funds, Defendants owed a fiduciary duty to Plaintiffs and the Class to store, maintain, and safeguard their cash deposits. Defendants were obligated to hold cash deposits for the benefit of Plaintiffs and the Class, and would not sell, loan, or otherwise alienate such funds except as instructed by Plaintiffs and the Class.

96.     Defendants also owed a fiduciary duty to provide access to cash deposits and return cash deposits upon reasonable demand.

20

97. Plaintiffs and the Class entrusted Defendants to ensure the safekeeping of their assets and to provide them with access to and control over their accounts and the assets within those accounts.

98. As alleged above, Defendants breached their fiduciary duties to Plaintiffs and the Class. Defendants failed to store, maintain, and safeguard Plaintiffs' and the Class's cash deposits. Defendants failed to employ reasonable measures to verify the accuracy and amount of account balances. Defendants failed to properly account for, provide access to, or timely return these funds.

99. As a result of the foregoing actions of Defendants, Plaintiffs and the Class have been damaged in an amount to be proven at trial. Plaintiffs seek all available remedies including general damages, special damages, punitive damages, injunctive relief, attorneys' fees, and costs.

## SIXTH CAUSE OF ACTION
### ACCOUNTING
### (Against all Defendants)

100. Plaintiffs restate the preceding allegations as if set forth herein.

101. Plaintiffs and the Class each registered accounts on one or more FinTech platforms that contracted with and utilized Synapse's services.

102. Plaintiffs and the Class each deposited funds at one or more of Defendants through the FinTech platforms.

103. Defendants had in their possession funds belonging to Plaintiffs and the Class.

104. Defendants have not returned the funds belonging to Plaintiffs and the Class in full.

105. Defendants have not provided access to the funds belonging to Plaintiffs and the Class.

21

106.    Defendants have failed to provide an accounting and/or sufficient information and documentation concerning the amount and location of Plaintiffs' and the Class's funds.

107.    Plaintiffs and the Class are entitled to accounting as it pertains to the amount and location of their funds.

108.    A remedy at law is inadequate because, without an accounting, Plaintiffs and the Class are unable to verify the extent of damage incurred as a result of Defendants' wrongdoing.

**SEVENTH CAUSE OF ACTION**
**CONSTRUCTIVE TRUST**
**(Against all Defendants)**

109.    Plaintiffs restate the preceding allegations as if set forth herein.

110.    Plaintiffs and the Class each registered accounts on one or more FinTech platforms that contracted with and utilized Synapse's services.

111.    Plaintiffs and the Class each deposited funds at one or more of Defendants through the FinTech platforms.

112.    Defendants had in their possession funds belonging to Plaintiffs and the Class.

113.    Defendants have not returned the funds belonging to Plaintiffs and the Class in full.

114.    Equity and justice require that Defendants be deemed to hold these funds in constructive trust for Plaintiffs and the Class.

115.    Plaintiffs and the Class are entitled to imposition of a constructive trust upon any accounts held by Defendants which contain funds belonging to Plaintiffs and the Class.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully prays for following relief:

a. Certification of this case as a class action on behalf of the proposed Class and any subclasses defined above, appointment of Plaintiffs as Class representatives, and appointment of their counsel as Class Counsel;

b. An award to Plaintiffs and the proposed Class and subclasses of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement;

c. An injunction ordering Defendants to cease the business practices complained of herein;

d. An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendants' conduct;

e. An award of nominal, punitive, and statutory damages where available;

f. Reasonable expenses and attorneys' fees;

g. Pre- and post-judgment interest, to the extent allowable; and

h. For such further relief that the Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the proposed Class, demand a trial by jury of all claims so triable.

Dated: June 25, 2025

/s/ *M. Anderson Berry*
M. Anderson Berry
Gregory Haroutunian
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
865 Howe Avenue
Sacramento, CA 95825
Tel: (916) 239-4778
Fax: (916) 924-1829
*aberry@justice4you.com*
*gharoutunian@justice4you.com*

Gary M. Klinger
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone:  (866) 252-0878
*gklinger@milberg.com*

J. Gerard Stranch, IV*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com

*Interim Co-Lead Counsel*

Alexander E. Wolf*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 South Beverly Hills Drive, Penthouse
Beverly Hills, CA 90212
Telephone: (872) 365-7060
*awolf@milberg.com*

Jeff Ostrow
Steven Sukert*
**KOPELITZ OSTROW P.A.**
One West Law Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 332-4200
ostrow@kolawyers.com
sukert@kolawyers.com

Timothy W. Emery*
**EMERY REDDY, PLLC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: 206-442-9106
Fax: 206-441-9711
*emeryt@emeryreddy.com*

Terence R. Coates
Dylan J. Gould

24

**MARKOVITS, STOCK & DEMARCO LLC**
119 East Court Street, Suite 350
Cincinnati, OH 45202
Telephone: (513) 651-3700
Fax: (513) 665-0219
tcoates@msdlegal.com
dgould@msdlegal.com

Andrew J. Shamis
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
*ashamis@shamisgentile.com*

Brian Levin*
**LEVIN LAW, P.A.**
2665 South Bayshore Drive, PH2B
Miami, Florida 33133
Mobile: (305) 613-0318
Direct: (305) 539-0593
Telephone (Bloomfield Hills): (248) 270-7338
*Brian@levinlawpa.com*

Adam Schwartzbaum*
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Telephone: 786-289-2643
*adam@edelsberglaw.com*

*\*Pro Hac Vice* Forthcoming

*Additional Attorneys for Plaintiffs*