# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Lead Civil Action No. 1:24-cv-03259-DDD-NRN**

*Consolidated with* 1:24-cv-03261-SBP;
1:24-cv-03262-SBP; 1:24-cv-03509-NRN;
1:25-cv-00075-KAS; and 1:25-cv-03284-DDD

OLGA MARGUL, KELLI JO CLAXTON,
HENRY YEH, COLIN SMITH, ROD
GENDRON, KAYLA MORRIS, TIMOTHY
MILLER, DAWN SAQUIN, IMENE HADDAD,
DANIEL BREWER, PAUL TONNER, CORY
ESPINOLA, STEPHANIE IZQUIETA,
KATHERINE MAUL, RICHARD TODD HALE,
ALFRED ROTIMI, and ASHLEY FELTON,
individually and on behalf of all similarly situated
persons,

     Plaintiffs,

v.

EVOLVE BANK & TRUST, an Arkansas bank;
AMG NATIONAL TRUST BANK, a Colorado
bank; LINEAGE BANK, a Tennessee bank, and
EVOLVE BANCORP, INC., an Arkansas
limited liability company,

     Defendants.

---

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
## JURY TRIAL DEMANDED

---

Plaintiffs Olga Margul, Kelli Jo Claxton, Henry Yeh, Colin Smith, Rod Gendron, Kayla Morris, Timothy Miller, Dawn Saquin, Imene Haddad, Daniel Brewer, Paul Tonner, Cory Espinola, Stephanie Izquieta, Katherine Maul, Richard Todd Hale, Alfred Rotimi, and Ashely Felton (collectively, the "Plaintiffs") bring this consolidated class action complaint on behalf of themselves and all others similarly situated against AMG National Trust Bank, a national bank ("AMG"), Evolve Bank & Trust, an Arkansas bank ("Evolve"), Evolve Bancorp, Inc., an Arkansas limited liability company ("Evolve Bancorp") (Evolve Bank & Trust and Evolve Bancorp, Inc. are collectively referred to hereinafter as the "Evolve Defendants"), and Lineage Bank, a Tennessee bank ("Lineage") (collectively, "Defendants"). The allegations contained in this consolidated class action complaint are based on Plaintiffs' personal knowledge of facts pertaining to themselves and upon information and belief, including further investigation conducted by Plaintiffs' counsel, as to the remainder.

## I.    NATURE OF THE ACTION

1.    This action arises from the negligent and/or fraudulent monitoring and mismanagement of funds belonging to Plaintiffs and Class Members who entrusted cash deposits to one or more of the Defendants via use of various financial technology platforms ("FinTechs").

2.    FinTechs are a growing sector of technology-based investing, money management, and wealth accumulation platforms, but are not themselves banks – meaning they cannot maintain custody of customer funds. Customer funds have to be maintained at actual banks, like Defendants.

3.    In this case, FinTechs used Defendants for their banking services, and Defendants in turn used a third-party company named Synapse Financial Technologies, Inc. ("Synapse") to open accounts, process transactions, and manage account statements and ledgers for any FinTech companies working with them, and ultimately for their end users.

4.    Defendants' use of Synapse and failure to adequately monitor and safeguard Plaintiffs' and Class Members' funds in their control led to significant ledger discrepancies in account balances. These irregularities were materially inaccurate and, as a result, could not be used as the basis for distributing funds to the end users.

5.    As a result of Defendants' acts and omissions, Plaintiffs and Class Members had their funds lost, stolen, or misplaced, while no single Defendant took responsibility for their failures. Further, Defendants have refused to return funds to these end users, leaving thousands of customers, like Plaintiffs and Class Members, without access to their funds.

6.    Relatedly, long prior to the collapse of Synapse, on information and belief the Evolve Defendants debited customer accounts for over $25 million according to Synapse's records. These transactions were never authorized by customers. Evolve had no right to take this money from customers and never informed its customers that it was doing so. On information and belief, Evolve Defendants also inflated the account balances that they reported to customers to make it appear as if the misappropriated funds remained in customers' accounts.

7.    On information and belief, according to Synapse's records, Evolve also misappropriated almost $50 million in customer money in connection with "migrating" another fintech company from Synapse's software to Evolve's software.

8.    On information and belief, Evolve was aware of this missing money (and more) by at least September of 2023. Despite this, they never told end user customers that their money was missing until Synapse's failure. To the contrary, they continued to represent that all customer money was in their possession and available.

3

## II.    PARTIES

9.      Plaintiff Olga Margul is a resident of the State of Massachusetts. She was present in Massachusetts at the time she signed up for an account with the FinTech Juno and deposited funds. On May 15, 2025, Plaintiff Margul attempted to withdraw her funds. $1,049 was actually transferred to Liberty Federal Credit Union from Juno, but the transfer was cancelled and the funds were clawed back to Juno on May 22, 2024. Plaintiff Margul was charged a transfer fee of $27.00 that was later refunded. At the time Plaintiff requested the withdrawal, her account balance showed $1,050.00. Months Later, Plaintiff Margul was offered $0.00 in reconciliation. Plaintiff appealed that offer and the appeal was rejected.

10.     Plaintiff Kelli Jo Claxton is a resident of the State of California. She was present in California at the time she signed up for an account with the FinTech Yotta and deposited funds. On May 10, 2024, Plaintiff Claxton attempted to withdraw her funds but was limited to a daily limit withdrawal of $10,000. On May 10th, 11th, 13th and 15th, she attempted to withdraw another $10,000 and all four withdrawals were cancelled. At the time she requested the withdrawal, her account balance showed $83,568.83. Months later, Plaintiff Claxton received $2,034.93 in reconciliation.

11.     Plaintiff Henry Yeh is a resident of the State of California. He was present in California at the time he signed up for an account with the FinTech Yotta and deposited funds. Plaintiff Yeh first attempted to withdraw his funds after he received the notice letter from Evolve in November 2024. To date, every withdrawal that Plaintiff Yeh attempted was cancelled. At the time he requested the withdrawal, his account balance showed $2,656.84. Plaintiff Yeh received $2.43 in reconciliation.

4

12.     Plaintiff Colin Smith is a resident of the State of Michigan. He was present in Michigan at the time he signed up for an account with the FinTech Yotta and deposited funds. On May 13, 2024, Plaintiff Smith attempted to withdraw $1,000 of his funds and his withdrawal was cancelled. At the time he requested the withdrawal, his account balanced showed $85,766.29. Months later, Plaintiff Smith was offered $0.00 in reconciliation. Plaintiff appealed that offer and the appeal was rejected.

13.     Plaintiff Rod Gendron is a resident of the State of Indiana. He was present in Indiana at the time he signed up for an account with the FinTech Juno and deposited funds. After Plaintiff Gendron noticed that his monthly interest rate fell sharply, he began transferring his money out of his Juno account but was only able to withdraw $15,000 between April 13, 2024 and May 8, 2024, before his access was cancelled. At the time of Plaintiff Gendron's first transfer, his Juno account balance showed $43,508.54. To date, Plaintiff Gendron has not been offered any money in reconciliation.

14.     Plaintiff Kayla Morris is a resident of the State of Arizona. She was present in Arizona at the time she signed up for an account with the FinTech Yotta and deposited funds. Between May 10, 2024, and May 13, 2024, Plaintiff Morris attempted to withdraw her funds seven times and all seven were cancelled. At the time she requested the withdrawals, Plaintiff Morris' balance showed $292,154.41. Months later, Plaintiff Morris received $579.08 in reconciliation. Additionally, Plaintiff Morris recently received an IRS Form 1099 for $800 in interest that she earned in 2024 though Yotta.

15.     Plaintiff Timothy Miller is a resident of the State of Maryland. He was present in Maryland at the time he signed up for an account with the FinTech Yotta and deposited funds. Plaintiff Miller attempted to withdraw his funds from Yotta in or around May 2024 and was unable

5

to do so. At the time of the requested withdrawal, Plaintiff Miller's balance showed $34,154.97. Months later, Plaintiff Miller received $11,936.98 in reconciliation.

16.    Plaintiff Dawn Saquin is a resident of the State of Washington. She was present in Washington at the time she signed up for an account with the FinTech Juno and deposited funds. Plaintiff Saquin attempted to withdraw her funds from her Juno account but was unable to do so. At the time of Plaintiff Saquin's withdrawal attempt, her balance showed $15,310.63. Later, Plaintiff Saquin received $38.43 in reconciliation.

17.    Plaintiff Imene Haddad is a resident of the State of Florida. She was present in Florida at the time she signed up for an account with the Fintech Juno and deposited funds. Plaintiff Haddad attempted to transfer her funds out of her Juno account but was unable to because a hold was placed on her account. At the time of her request, Plaintiff Haddad's balance showed around $26,000. Plaintiff Haddad later received around $15,000 in reconciliation.

18.    Plaintiff Daniel Brewer is a resident of the State of Utah. He was present in Utah at the time he signed up for an account with the FinTech Yotta and deposited funds. Plaintiff Brewer attempted to withdraw funds about four times, but each withdrawal was cancelled. Plaintiff Brewer eventually received an email stating that his account was put on hold. At the time he requested the withdrawals, Plaintiff Brewer's balance showed $10,653.40. Plaintiff Brewer was later offered around $0.71 in reconciliation.

19.    Plaintiff Paul Tonner is a resident and citizen of the State of Illinois. He was present in Illinois at the time he signed up for an account with the FinTech Yotta on January 5, 2021, and deposited funds. Plaintiff Tonner attempted to withdraw his funds from Yotta on May 9, 2024, and his withdrawal was cancelled. At the time he requested the withdrawal, Plaintiff Tonner's balance showed $1,543.55. Months later, Plaintiff Tonner received $0.04 in reconciliation.

6

20.    Plaintiff Cory Espinola is a resident of the State of New York. She was present in New York at the time she signed up for an account with the FinTech Juno and deposited funds. Plaintiff Espinola did not attempt to withdraw funds because his account was frozen when he discovered the problems with his deposit. At that time, Plaintiff Espinola had around $34,000 in his account. Plaintiff Espinola was not offered any money in reconciliation.

21.    Plaintiff Stephanie Izquieta is a resident of the State of New York. She was present in New York at the time she signed up for an account with the FinTech Juno and deposited funds. Plaintiff Izquieta's balance showed $26,889.60. Months later, Plaintiff Izquieta was offered $133.00 in reconciliation.

22.    Plaintiff Katherine Maul is a resident of the State of Missouri. She was present in the state of Missouri at the time she signed up for an account with the FinTech Yotta and deposited funds. Plaintiff Maul attempted to withdraw her funds from Yotta on May 28, 2024, and her withdrawal was cancelled. At the time she requested the withdrawal, Plaintiff Maul's balance showed $22,000. Months later, Plaintiff Maul received $0.42 in reconciliation.

23.    Plaintiff Richard Todd Hale is a resident of the State of Oklahoma. He was present in Austin, Texas at the time he signed up for an account with the FinTech Mainvest Inc. and deposited funds. On March 24, 2025, Lineage sent an email to Plaintiff Hale that included a link to an electronic payment for a sum less than his balance held by Mainvest, Inc. Plaintiff Hale's deposited balance with Mainvest, Inc. was approximately $300.00. Lineage offered Plaintiff Hale $12.41 in reconciliation. Plaintiff Hale was asked by Lineage to sign a release to receive the funds, but Plaintiff Hale did not sign the release and did not accept the funds.

24.    Plaintiff Alfred Rotimi is a resident of the State of Maryland. He was present in Maryland at the time he signed up for an account with the FinTech Mainvest, Inc. to raise funds

7

for his company Joyhound Beer Company, LLC. On November 8, 2024, Lineage sent an email to Plaintiff Rotimi that included a link to an electronic payment for a sum less than his balance held by Mainvest, Inc. Plaintiff Hale's balance with Mainvest, Inc. was $126,500. Lineage offered Plaintiff Hale $125,980 in reconciliation. Plaintiff was asked by Lineage to sign a release to receive the funds, but Plaintiff Hale did not sign the release, but he did receive $125,980.

25.    Plaintiff Ashley Felton ("Felton") is and at all relevant times has resided in the County of Milwaukee, State of Wisconsin. On November 5, 2024, Ms. Felton received an e-mail from support@withyota.com that "according to the Synapse Trial Balance Report, your funds are with Evolve Bank & Trust." Ms. Felton's online Account Statements provide on each and every page: "Banking Services provided by…or Evolve Bank & Trust, Members FDIC." According to the current statement, Ms. Felton had a depository account balance of $7,464.53 on November 5, 2024. In Ms. Felton's online depository account Settings page, the account represents her "Bank Name" as Evolve Bank & Trust. As pled herein, there is a sum certain that was misappropriated belonging to Plaintiff Felton of $7,464.53.

26.    Defendant AMG National Trust Bank is a bank chartered under the laws of the United States, whose corporate headquarters and principal place of business is located at 1155 Canyon Boulevard, Suite 310, Boulder, Colorado 80302.

27.    Defendant Evolve Bank & Trust is a bank chartered under the laws of Arkansas with twenty-six locations in ten states. Its corporate headquarters and principal place of business is located at 301 Shoppingway Boulevard, West Memphis, Arkansas 72301.

28.    Defendant Lineage Bank is a bank chartered under the laws of Tennessee whose corporate headquarters and principal place of business is located at 3359 Aspen Grove Drive, Franklin, Tennessee 37067.

29.    Defendant Evolve Bancorp, Inc. is a bank holding company organized under the laws of Arkansas whose corporate headquarters is located at 6000 Poplar Avenue, Suite 300, Memphis, Tennessee, 38119. Evolve Bancorp is a registered bank holding company that owns and controls Evolve Bank & Trust. Federal banking regulators have directly included Evolve Bancorp in enforcement proceedings, and the Federal Reserve Board's Cease and Desist Order dated June 11, 2024 requires Evolve Bancorp to "take appropriate steps to fully utilize Bancorp's financial and managerial resources, pursuant to section 38A of the FDI Act (12 U.S.C. § 1831o-1) and section 225.4(a) of Regulation Y of the Board of Governors (12 C.F.R. § 225.4(a)), to serve as a source of strength to the Bank." Evolve Bancorp is an appropriate defendant in this action because: (a) as a registered bank holding company, Evolve Bancorp owns and controls Evolve Bank & Trust and is subject to independent regulatory obligations regarding the safety and soundness of its subsidiary bank; (b) federal banking regulators have directly named Evolve Bancorp in enforcement proceedings arising from the same conduct at issue in this litigation; (c) the Federal Reserve's Cease and Desist Order imposes affirmative obligations on Evolve Bancorp to serve as a source of financial and managerial strength to Evolve Bank & Trust, obligations that Evolve Bancorp breached; (d) many end user accounts were designated as held at Evolve Bank & Trust, an institution that Evolve Bancorp was legally obligated to supervise and support; and (e) on information and belief, Evolve Bancorp had knowledge of the operational and compliance deficiencies at Evolve Bank & Trust and failed to exercise its authority and resources to remedy those deficiencies. On information and belief, Evolve Bancorp is a co-conspirator of, acted jointly with, and exercised control over Evolve Bank & Trust as to all allegations herein, and is independently liable for its failure to fulfill its regulatory and fiduciary obligations as the bank holding company.

9

## III.    JURISDICTION AND VENUE[1]

30.    This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (i) there are at least 100 class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one putative class member and one Defendant are citizens of different states.

31.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims herein occurred in this judicial district.

32.    Further, as set forth herein, Defendants have contacts in this district sufficient to subject them to the personal jurisdiction of this district as if this district were a separate state. Upon information and belief, Defendants transacted with consumers in this district. Upon information and belief, Defendants continuously and systematically offered banking services to consumers in this District, maintained an interactive commercial service through the FinTechs at issue, and allowed customers in this District to transact with Defendants. Upon information and belief, Defendants all conduct substantial business in this District and a substantial part of the acts and omissions complained of occurred in this District. Upon information and belief, each Defendant either has a physical presence in Colorado, offers banking services in Colorado, and/or transacts with customers physically present in Colorado. Additionally, AMG has its principal place of business in Colorado; and Evolve Bank & Trust and Lineage Bank do not object to resolving this litigation in this District.

---

[1] Plaintiff Felton's action, Case No. 1:25-cv-03284-DDD, was originally filed in the Central District of California and was consolidated into this action by order of this Court. Plaintiff Felton joins in this consolidated complaint but does not individually affirm the jurisdictional and venue allegations set forth in paragraphs 31–33 to the extent those allegations are outside her personal knowledge. Plaintiff Felton reserves all rights regarding jurisdiction and venue.

33.     Exercising jurisdiction over Defendants is fair, just, and reasonable considering the quality and nature of Defendants' acts that occur in Colorado and which affect interests located in Colorado. Upon information and belief, Defendants have purposefully availed themselves of the privilege of conducting activities in Colorado and should reasonably anticipate being haled into court in Colorado.

## IV.     GENERAL ALLEGATIONS

**Fintech Platforms and Financial Accounts**

34.     Companies colloquially described as "FinTechs" are financial technology businesses that offer software with the goal of helping individuals manage their finances. Most FinTechs offer web- and mobile application-based solutions as alternatives to traditional banks.

35.     Because the FinTechs at issue are not themselves banks, they could not accept and retain customer deposits. Rather, the FinTechs partnered with Defendants who, in turn, maintained custody of customers' funds. In other words, the FinTechs allowed their customers (i.e., ordinary members of the public) to deposit cash into Defendants through the FinTechs' online platforms, mediated by Synapse, and Defendants maintained custody of these funds.

36.     Like any banking customer, FinTech users reasonably believed their funds were being held at Defendants in a safe and secure manner and were available to access and withdraw on demand. FinTech users also reasonably believed their account balances (the dollar figure shown to users on the FinTech platforms) were accurate.

**Synapse Financial Technologies, Inc. Collapses**

37.     Synapse was founded in 2014. Synapse touted itself as the pioneer of the banking-as-a-service ("BaaS") model. It functioned as a middleman between traditional banks and FinTechs. In this role, Synapse opened deposit accounts on behalf of approximately 100 FinTech

companies and their end users at four different banks—Evolve, American Bank, AMG, and Lineage—and Synapse managed the account ledgers.

38.    More specifically, beginning in 2014, Synapse opened Demand Deposit Accounts ("DDAs") on behalf of approximately 100 FinTechs and their end users at Defendants.

39.    Beginning in 2020, Synapse developed its cash management program in connection with its subsidiary, Synapse Brokerage LLC ("Synapse Brokerage"), through which Synapse began opening Cash Management Accounts ("CMA Accounts") on behalf of the FinTechs and their end users at Defendants.

40.    Most end user funds were held in omnibus "For Benefit Of" Accounts ("FBO Accounts")[2] and the remaining funds are held in DDAs across the Partner Banks.

41.    In doing so, Synapse combined data received from Partner Banks with its own customer transaction data and delivered that data to the FinTechs. This meant that FinTech users relied on the FinTechs and Partner Banks to account for users' funds; and the FinTechs and Partner Banks, in turn, relied in part on Synapse to keep track of users' funds.

42.    Starting in approximately 2022, Evolve (referred to as "DDA Bank 1" in regulatory filings) and Synapse maintained ledgers with substantial differences regarding the amount of end user funds held in FBO accounts at Evolve. Synapse's records reflected more end user funds on deposit at Evolve than Evolve claimed to hold.

43.    By September 2023, facing the ledgering discrepancy with Evolve, Synapse decided to launch a cash management program through its wholly owned subsidiary Synapse Brokerage to hold end user funds.

---

[2] A "For Benefit Of" or "FBO" account is a type of custodial account. It is a pooled account that allows a company to manage funds on behalf of, or "for the benefit of," one or more of their users without assuming legal ownership of that account.

12

44.     From September 2023 through May 2024, Synapse Brokerage operated a cash management program where customer funds were supposedly swept from banks like Evolve to multiple "Program Banks" or "Partner Banks" to maximize FDIC coverage, including AMG and Lineage (referred to as "DDA Bank 2" in regulatory filings).

45.     On April 22, 2024, Synapse filed for Chapter 11 bankruptcy in the Central District of California. After the bankruptcy filing, it came to light that approximately *$85 million* in customer funds across *100,000 customers* had gone missing.

46.     The bankruptcy process has revealed significant failings, including that Synapse and Defendants did not maintain accurate ledgers, leading to incorrect customer fund balances. As a result, many customers have been left unable to access funds held at Defendants and unable to pay essential bills or living expenses.

47.     Additionally, Jeffrey Alan Stanley and Mark Elliot Paverman, former Synapse senior executives, are now the subject of FINRA disciplinary proceedings.[3]

---

[3] Any potential fraud-based claims and other claims against Synapse, Alan Stanley, and Mark Elliot Paverman are not at issue in this action, which generally seeks to restore missing end user funds to the rightful end users via claims for money had and received and unjust enrichment against Defendants. As explained herein, the funds are allegedly held by one or more Defendants.

Plaintiff Felton, through counsel Lindemann Law Firm, APC, intends to file a separate class action in the Central District of California against Synapse Financial Technologies, Inc., Synapse Brokerage, LLC, Jeffrey Alan Stanley, and Mark Elliot Paverman. Stanley and Paverman are the subject of pending FINRA disciplinary proceedings, *Department of Enforcement v. Jeffrey Alan Stanley and Mark Elliot Paverman*, No. 2023080111701, arising from errors and omissions and other misconduct. Plaintiff Felton states these entities and individuals reside and/or conduct business in a district outside of Colorado, and this Court may lack personal jurisdiction over them. Lindemann Law Firm, APC serves as counsel for Plaintiff Felton as to all claims against Synapse Financial Technologies, Inc., Synapse Brokerage, LLC, Stanley, and Paverman. Plaintiff Felton and her counsel reserve all rights with respect to the prosecution of those claims.

**Defendants Have Not Returned All Customer Funds**

48.     Following Synapse's collapse, Defendants allegedly began reconciling customers' funds and working to correct the materially inaccurate ledgers. Despite these purported efforts, the Partner Banks have not accounted for and returned all deposits belonging to FinTech users. Instead, Defendants are (1) blaming each other for the inability to unwind Synapse's ledger and fully reconcile missing user funds, and/or (2) asserting that all funds maintained at those Partner Banks have been distributed.

49.     For example, according to Synapse's bankruptcy filings from November 2024, Evolve reported publicly that it concluded its reconciliation efforts as of October 18, 2024. Evolve also reported that it would begin notifying end users of funds held and making distributions on November 4, 2024. According to the bankruptcy Trustee's direct communications from end users and publicly available information, Evolve notified many end users that it holds funds for those end users in amounts considerably *less* than shown on the Synapse ledger. As a result, Evolve will distribute considerately less to such end users, and Evolve asserts that the missing funds are in the custody of other Partner Banks.

50.     AMG and Lineage, on the other hand, dispute the accuracy of Evolve's reconciliation. For example, in a public letter dated November 12, 2024, these two banks contend that "calculating specific end user balances by bank was impossible because Synapse often directed large bulk bank-to-bank transfers of funds that bore no relationship whatsoever to specific individual end users or their transactions." AMG and Lineage also denied that they hold "substantial additional funds" belonging to fintech users, instead claiming that they already distributed over 99% and 90%, respectively, of funds owed to FinTech users.

14

51.    The result is that many customers are left without access to their cash deposits and with no clear ability to discern which of the Defendants holds their money, but their money is necessarily held by one or more of the Defendants.

**The Failure to Maintain, Account, and Provide Access to Customer Funds Confirms Material Risk Management Failures**

52.    Defendants' inability to track and provide immediate access to customer funds is indicative of material risk management failures.

53.    For example, Evolve was issued a cease-and-desist order by the Federal Reserve on June 14, 2024, two months after the Synapse bankruptcy filing.[4] This order stemmed from an examination of Evolve conducted in early 2023. Therefore, Evolve Bank must have been aware of significant operational and compliance issues for at least one year preceding Synapse's bankruptcy filing.

54.    Similarly, Lineage Bank entered a Consent Order with the FDIC on January 30, 2024, four months before the Synapse bankruptcy filing.[5] Although this consent order did not specify the timing of an earlier exam, the level of detail and breadth of issues contained in the consent order also suggest that significant compliance issues existed and must have been known by Lineage Bank well before Synapse's bankruptcy filing.

---

[4] Cease & Desist Order Issued Upon Consent, *In re Evolve Bancorp*, Docket Nos. 24-012-B-HC, 24-012-B-SM,              (FRS              June              7,              2024), https://www.federalreserve.gov/newsevents/pressreleases/files/ enf20240614a1.pdf (last visited Dec. 18, 2024). *See also* FRS, *Federal Reserve Board issues an enforcement action against Evolve Bancorp, Inc. and Evolve Bank & Trust for deficiencies in the bank's anti-money laundering, risk management, and consumer compliance programs*, 2024 WLNR 9413232, (June 14, 2024), and available          at:          https://www.federalreserve.gov/newsevents/pressreleases/enforcement 20240614a.htm (last visited Dec. 18, 2024).

[5] Consent Order, *In the Matter of Lineage Bank, Franklin, Tennessee, (Insured State Nonmember Bank)*,              FDIC-23-0041b              (Jan.              30,              2024), https://orders.fdic.gov/sfc/servlet.shepherd/document/download/0693d 00000BrElHAAV?operationContext=S1 (last visited Dec. 18, 2024).

55.     Banks are expected to maintain contingency and business continuity plans that address the potential failure of critical third parties. Synapse was clearly such a critical third party, and yet none of the Defendants had a plan in place for what to do in the event of operational issues at Synapse—let alone failure.

56.     Defendants' lack of direct bank access to Synapse's ledger, lack of contingency planning, and failure to maintain their own copy of the ledger all contributed to their respective failures to fulfill the most fundamental responsibility in banking: to keep track of the money.

57.     The fact that the failure of a startup technology provider left several banks unable to process accounts worth over $250 million, and that millions of dollars remain frozen more than four months later (with, upon information and belief, many millions unaccounted for) means those banks had major lapses in their risk management.

58.     Had Defendants pushed sooner or more forcibly for detailed reconciliations or greater access to Synapse's systems, the Partner Banks would have recognized the scope of the problem. Defendants also could have remedied the problem without freezing users out of access to their funds.

59.     Plaintiffs and Class Members, through their accounts with various FinTechs, deposited money into Defendants which they have been unable to access for months.

60.     Moreover, Plaintiffs and Class Members have now been offered only a small percentage of the funds they deposited with Defendants through the FinTechs back.

61.     Upon information and belief, Plaintiffs' and Class Members' remaining funds are still in Defendants' hands and Defendants are acting so as to keep said funds despite those funds belonging Plaintiffs and Class Members.

16

**FDIC Insurance Misrepresentations**

62.    In order to entice the deposit of funds, Plaintiffs and Class Members were led to believe their deposits were FDIC insured and protected against all losses, including losses relating in any way to failure, misplacement, or mismanagement.

63.    For example, Ms. Felton's and Yotta end users' monthly Account Statements provide on every page: "Banking Services provided by…or Evolve Bank & Trust, Members FDIC." On information and belief, these representations were made by Evolve and at Evolve's direction.

64.    Further, during the Class Period, Evolve had an interactive website that prominently stated "FDIC Insured backed by the full faith and credit of the United States Government" on several pages, statements, and documents.

65.    On information and belief, this turned out to be false based on the structure created by Evolve using FBO accounts. Under 12 C.F.R. § 330.5, FDIC insurance can "pass through" to the beneficial owners of FBO accounts only if: (a) the bank maintains records showing each beneficial owner and their balance; (b) the beneficial owners must be identifiable as having a legal right to the funds; and (c) customers must be notified of the arrangement and their insurance status. In actuality, on information and belief, Evolve's representation that funds were protected by minimum FDIC coverage was false because the pooled FBO accounts did not comply with 12 C.F.R. § 330.5.

66.    As a result, Plaintiffs and the Class could not obtain FDIC insurance of up to $250,000 for each account holder, and their funds were not protected from loss.

17

67.     And even assuming Plaintiffs and the Class's deposited fund were technically FDIC insured, at minimum, the funds were not protected from the type of mismanagement and malfeasance at issue despite Plaintiffs and the Class being led to believe otherwise by Evolve.[6]

68.     Evolve Defendants owed Plaintiffs and the Class a duty to disclose material facts regarding the actual scope and limitations of FDIC insurance coverage for funds deposited through the FinTech platform arrangements. This duty arose from: (a) the special relationship between the Evolve Defendants as a bank and Plaintiffs and Class Members as beneficial owners of funds held in the Evolve Defendants' FBO accounts; (b) Evolve Defendants' superior and exclusive knowledge regarding the structure, operation, and FDIC insurance implications of the pooled FBO account arrangement; (c) Evolve Defendants' partial representations and marketing materials suggesting that customer deposits were "FDIC insured" without disclosing the limitations and conditions of such coverage; and (d) Evolve Defendants' regulatory obligations as an FDIC-insured institution to ensure proper disclosure of deposit insurance coverage.

---

[6] On August 27, 2025, the California Department of Financial Protection and Innovation ("DFPI") issued a Desist and Refrain Order, Claim for Ancillary Relief, and Notice of Intent to Assess Administrative Penalties against CapitalJ, Inc. d/b/a Juno, one of the FinTech platforms through which Plaintiffs and Class Members deposited funds with Evolve. The DFPI found that Juno engaged in deceptive acts or practices in violation of California Financial Code section 90003(a)(1) by representing to consumers that their cash deposits were "safe," "covered against all risks," and "FDIC insured" through Evolve Bank & Trust. The DFPI ordered Juno to pay restitution to California consumers and issued a notice of intent to assess penalties of $9,142,500. The DFPI's findings reflect that the FDIC insurance representations made to Plaintiffs and members of the FDIC Representation Subclass—including representations that deposits were "FDIC insured up to $250,000 through our partner, Evolve Bank and Trust, Member FDIC"—were deceptive, and that consumers who relied on those representations and filed FDIC insurance claims were told that FDIC insurance was not available to cover their losses. At least 3,657 California consumers with Juno accounts lost access to a combined minimum of $6 million in funds as a result of these deceptive practices. *See* https://dfpi.ca.gov/wp-content/uploads/2025/09/D-R-CapitalJ_-Inc.-dba-Juno.pdf.

69.     On information and belief, at all times during the Class Period, Evolve knew that: (a) customer funds were held in pooled FBO accounts rather than individual customer accounts; (b) the aggregate balance in these pooled FBO accounts routinely exceeded $250,000 and contained hundreds of millions of dollars in customer deposits; (c) FDIC insurance coverage for funds held in FBO accounts depends on the bank maintaining adequate records identifying each beneficial owner and their specific account balance; (d) Synapse, not Evolve, maintained the individual customer ledgers necessary to establish beneficial ownership for FDIC insurance purposes; (e) beginning no later than September 2023, Evolve knew that Synapse's record-keeping was unreliable and that substantial customer funds were missing or misappropriated; and (f) the collapse of the Synapse relationship would likely result in the loss of FDIC insurance coverage for most or all individual customer deposits held in the pooled FBO accounts.

70.     On information and belief, Despite this knowledge, Evolve failed to conspicuously disclose to Plaintiffs and the Class that: (a) FDIC insurance coverage for customer deposits was contingent upon maintaining accurate beneficial ownership records through a third-party (Synapse); (b) if Synapse's record-keeping failed or became inaccessible, individual customers would lose their FDIC insurance coverage; and (c) beginning in September 2023, Evolve knew that customer funds were missing and that the record-keeping necessary for FDIC insurance coverage was compromised.

**Defendants' Statutory Duties (Alleged by Plaintiff Felton's Action)**

71.     On information and belief, at least some Plaintiffs and Class Members' accounts are domiciled in California because the entities that assisted in the creation and administration of those accounts—for example, Synapse Financial Technologies, Inc. (headquartered in San Francisco, California) and California-based FinTechs like Yotta and Juno—had their principal

places of business in California and established the accounts from California. On information and belief, Synapse opened, configured, and maintained the underlying account structures from its California headquarters, and many FinTech platforms through which Plaintiffs and Class Members enrolled and deposited funds operated their account creation and management systems from California.

72.    Accordingly, Defendants owed statutory duties to Plaintiffs and Class Members under California Commercial Code § 3405 (misappropriated funds in accounts domiciled in California administered by an "employee" including independent contractor Synapse), California Commercial Code § 4401 (a customer account domiciled in California may only be frozen or debited for amounts properly payable), California Financial Code § 1777 (duty of care in electronic fund transfers involving California-domiciled accounts), California Financial Code § 1200 et seq., California Financial Code § 850 et seq., Commercial Code § 4406 (duty to exercise ordinary care in processing items in California domiciled accounts). Defendants' violations of these statutes constitute negligence per se of independent duties.

## V.    CLASS ACTION ALLEGATIONS

73.    Plaintiffs bring this action on behalf of themselves and all persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and seek certification of the following class and subclass:

> **Nationwide Class:** All persons residing in the United States who have been denied access to their funds at any time deposited with, held in the name of, affiliated with, or otherwise designated as held at Evolve Bank & Trust/Evolve Bancorp, AMG National Trust, or Lineage Bank, beginning April 22, 2024.

> **FDIC Representation Subclass:** All persons residing in the United States (i) whose account statements, account interfaces, or account settings contained representations by or on behalf of Evolve Bank & Trust/Evolve Bancorp that their deposits were FDIC insured, and (ii) who have been denied access to their funds at any time deposited with, held in the name of, affiliated with, or otherwise

designated as held at Evolve Bank & Trust/Evolve Bancorp, beginning April 22, 2024.

74. The Nationwide Class and the FDIC Representation Subclass are collectively referred to as the "Class" and "Class Members." Excluded from the Class are the Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendants have or had a controlling interest.

75. Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions stated above, including the addition of one or more subclasses, in connection with a motion for class certification, or at any other time, based upon, among other things, changing circumstances, or new facts obtained during discovery.

76. **Numerosity.** The Class is so numerous that joinder of all members in one action is impracticable. The exact number and identities of the members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, but upon information and belief, Plaintiffs allege that there are in excess of 1,000 members of the Class.

77. **Typicality.** Plaintiffs' claims are typical of those of other members of the Class, all of whom have suffered similar harm due to Defendants' course of conduct as described herein.

78. **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs have retained attorneys who are experienced in the handling of complex litigation and class actions, and Plaintiffs and their counsel intend to diligently prosecute this action.

79. **Existence and Predominance of Common Questions of Law or Fact.** Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which

do not vary among members of the Class, and which may be determined without reference to the individual circumstances of any member of the Class, include, but are not limited to, the following:

    a.   Whether Defendants held funds belonging to members of the Class.

    b.   Whether Defendants were obligated to return funds to members of the Class.

    c.   Whether Defendants converted and/or refused to return funds belonging to members of the Class.

    d.   Whether Defendants failed to adequately track, safeguard, and maintain funds belonging to members of the Class.

    e.   Whether Plaintiffs and the Class have sustained damages.

    f.   Whether Plaintiffs and the Class are entitled to restitution.

    g.   Whether injunctive relief is appropriate and necessary.

    h.   Whether Defendants' conduct was undertaken with conscious disregard of the rights of the members of the Class and was done with fraud, oppression, and/or malice.

80.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Requiring each individual class member to file an individual lawsuit would unreasonably consume the amounts that may be recovered. Even if every member of the Class could afford individual litigation, the adjudication of at least tens of thousands of identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the

issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the members of the Class. Plaintiffs anticipate no difficulty in the management of this action as a class action. The prosecution of separate actions by individual members of the Class may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to such adjudications, or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

## VI.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**MONEY HAD AND RECEIVED**
**(Against all Defendants)**

81.    Plaintiffs restate the preceding allegations as if set forth herein.

82.    Plaintiffs and the Class each registered accounts on one or more FinTech platforms that contracted with and utilized Synapse's services.

83.    Plaintiffs and the Class each deposited funds at one or more of Defendants through the FinTech platforms.

84.    Defendants had in their possession funds belonging to Plaintiffs and the Class. Plaintiffs and the Class are the owners, and entitled to possession, of their respective funds deposited at Defendants.

85.    Defendants have not returned the funds belonging to Plaintiffs and the Class in full.

86.    Defendants have refused access to the funds belonging to Plaintiffs and the Class.

87.    Accordingly, as more fully set forth above, Defendants had in their possession money which in equity and good conscience belongs to Plaintiffs and Class Members. That money should be refunded to Plaintiffs and Class Members.

23

**SECOND CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Against all Defendants)**

88.     Plaintiffs restate the preceding allegations as if set forth herein.

89.     This claim is pleaded in the alternative to Plaintiffs' remaining claims.

90.     Plaintiffs and the Class each registered accounts on one or more FinTech platforms that contracted with and utilized Synapse's services.

91.     Plaintiffs and the Class each deposited funds at one or more of Defendants through the FinTech platforms.

92.     Defendants had in their possession funds belonging to Plaintiffs and the Class.

93.     Defendants have not returned the funds belonging to Plaintiffs and the Class in full.

94.     Defendants have been unjustly enriched in retraining the cash deposits belonging to Plaintiffs and the Class.

95.     Defendants have also been unjustly enriched by accruing interest and deriving profits from the unauthorized use of Plaintiffs' and the Class's funds.

96.     Defendants' retention of this money under the circumstances is unjust and inequitable.

97.     As a direct and proximate result of Defendants' misconduct, Plaintiffs and the Class are entitled to restitution and disgorgement in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE**
**(Against all Defendants)**

98.     Plaintiffs restate the preceding allegations as if set forth herein.

99.     Plaintiffs and Defendants have a special relationship that gives rise to Defendants' duties to Plaintiffs and Class Members to act reasonably to (a) hold cash deposits for Plaintiffs'

and the Class's benefit; (b) allow Plaintiffs and the Class to access their cash deposits on demand and/or with reasonable notice; (c) protect Plaintiffs and the Class from unreasonable interference with their right and ability to access their funds; and (d) employ commercially adequate practices and procedures regarding the accounting and tracking of such funds.

100.    Multiple indicia of a special relationship are present:

a.    First, the transfer of funds to Partner Banks were intended to affect Plaintiffs. Plaintiffs were the ultimate beneficiaries of the transferred funds, the Partner Banks were holding the funds for Plaintiffs' benefit, and Plaintiffs trusted the Partner Banks to maintain and safeguard cash deposits.

b.    Second, the harm was foreseeable as Defendants were fully aware of the consequences of inadequate recordkeeping and the refusal to provide prompt access to cash deposits.

c.    Third, there is a high degree of certainty that Plaintiffs would suffer and in fact suffered injury by the denial of access to cash deposits. The inability to use funds, lost opportunity costs, lost accrued interest, and inability to pay ordinary living expenses are clear examples of foreseeable harm.

d.    Fourth, Plaintiffs' injuries are closely connected to Defendants' conduct—the harm stems directly from Defendants' failure to safeguard, account for, and return cash funds.

e.    Fifth, Defendants' alleged negligence is morally culpable. As explained above, Defendants' failure to track and provide immediate access to customer funds is indicative of material risk management failures. Defendants also treat noncustomer beneficiaries, like Plaintiffs, different from ordinary depositors. For deposits

received from non-bank companies (like FinTechs) which are maintained on behalf of third-party consumer beneficiaries, Defendants did not keep independent, accurate, and reliable ledgers. In other words, despite knowing the deposits were held for third party beneficiaries, Defendants did not maintain adequate records identifying the beneficial owners of those deposits and the account balance attributable to each beneficial owner.

    f.    Sixth, the policy of preventing future harm militates in favor of finding a special relationship. The nature of the harm—the sudden inability to pay ordinary bills—is profound, and imposing negligence liability would encourage companies facing similar circumstances in the future to act more carefully.

101.    Defendants each breached their duty to Plaintiffs and the Class by failing to maintain and hold cash deposits, failing to accurately account for cash deposits, and denying access to cash deposits without cause.

102.    The harms inflicted upon Plaintiffs and Class members were reasonably foreseeable. Defendants were aware that consumers relied upon financial institutions to store and safeguard cash deposits and provide prompt access to cash deposits.

103.    Defendants were also aware that the failure to provide access to cash deposits was likely to result in harm above and beyond the amount of the account balance, including the inability to satisfy other debts and pay for necessities of life.

104.    As a direct and proximate result of Defendants' failures described herein, Plaintiffs and the Class have been deprived of their cash deposits, access to cash deposits, accrued interest thereon.

105.    Plaintiffs and the Class have also suffered emotional distress, anxiety, and fear upon being notified that their accounts were frozen and cash balances inaccessible and/or misplaced.

106.    Plaintiffs, on behalf of themselves and the Class, seek damages and interest thereon in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### CONVERSION
### (Against all Defendants)

107.    Plaintiffs restate the preceding allegations as if set forth herein.

108.    Plaintiffs and the Class deposited funds with Defendants.

109.    Plaintiffs and the Class owned and had a right to possess the cash funds deposited with Defendants.

110.    Plaintiffs and the Class, through the "reconciliation process" that has occurred as a result of the Synapse bankruptcy, among other avenues, demanded the return of their cash funds deposited with Defendants.

111.    Defendants wrongfully refused to return the property deposited by Plaintiffs and the Class upon proper demand. Defendants have refused to return, lost, or wrongfully disposed of the property deposited by Plaintiffs and the Class.

112.    Plaintiffs and the Class did not consent to the misconduct described herein.

113.    Defendants' misconduct injured Plaintiffs and the Class.

114.    On information and belief, Defendants' actions were willful and malicious in that they did not intend to pay Plaintiffs' customer deposits, and instead intended to use the deposits willfully and maliciously to harm Plaintiffs.

114.    As described above, the converted funds are specifically identifiable and in a fixed amount.

27

115. As a result of the foregoing actions of Defendants, Plaintiffs and the Class have been damaged in an amount to be proven at trial. Plaintiffs seek all available remedies including general damages, special damages, punitive damages, injunctive relief, attorneys' fees, and costs.

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(Against all Defendants)**

116. Plaintiffs restate the preceding allegations as if set forth herein.

117. As the custodian of funds, Defendants owed a fiduciary duty to Plaintiffs and the Class to store, maintain, and safeguard their cash deposits. Defendants were obligated to hold cash deposits for the benefit of Plaintiffs and the Class, and would not sell, loan, or otherwise alienate such funds except as instructed by Plaintiffs and the Class.

118. Defendants also owed a fiduciary duty to provide access to cash deposits and return cash deposits upon reasonable demand.

119. For end users of California-based FinTecs (e.g., Yotta and Juno) with California-based accounts, Evolve and Bancorp owed a duty based on the various California statutory duties pled heretofore.

120. Plaintiffs and the Class entrusted Defendants to ensure the safekeeping of their assets and to provide them with access to and control over their accounts and the assets within those accounts.

121. Defendants acted against Plaintiffs and the Class Members' interest in refusing to execute full withdrawals from the accounts. Evolve and Bancorp also committed misconduct in connection with the accounts and failure to meet the requirements for FDIC insurance.

122. As alleged above, Defendants breached their fiduciary duties to Plaintiffs and the Class. Defendants failed to store, maintain, and safeguard Plaintiffs' and the Class's cash deposits.

28

Defendants failed to employ reasonable measures to verify the accuracy and amount of account balances. Defendants failed to properly account for, provide access to, or timely return these funds.

123.    As a result of the foregoing actions of Defendants, Plaintiffs and the Class have been damaged in an amount to be proven at trial. Plaintiffs seek all available remedies including general damages, special damages, punitive damages, injunctive relief, attorneys' fees, and costs.

## SIXTH CAUSE OF ACTION
### ACCOUNTING
**(Against all Defendants)**

124.    Plaintiffs restate the preceding allegations as if set forth herein.

125.    Plaintiffs and the Class each registered accounts on one or more FinTech platforms that contracted with and utilized Synapse's services.

126.    Plaintiffs and the Class each deposited funds at one or more of Defendants through the FinTech platforms.

127.    Defendants had in their possession funds belonging to Plaintiffs and the Class.

128.    Defendants have not returned the funds belonging to Plaintiffs and the Class in full.

129.    Defendants have not provided access to the funds belonging to Plaintiffs and the Class.

130.    Defendants failed to provide an accounting and/or sufficient information and documentation concerning the amount and location of Plaintiffs' and the Class's funds.

131.    Plaintiffs and the Class are entitled to accounting as it pertains to the amount and location of their funds.

132.    A remedy at law is inadequate because, without an accounting, Plaintiffs and the Class are unable to verify the extent of damage incurred as a result of Defendants' wrongdoing.

## SEVENTH CAUSE OF ACTION
### CONSTRUCTIVE TRUST
### (Against all Defendants)

133.    Plaintiffs restate the preceding allegations as if set forth herein.

134.    Plaintiffs and the Class each registered accounts on one or more FinTech platforms that contracted with and utilized Synapse's services.

135.    Plaintiffs and the Class each deposited funds at one or more of Defendants through the FinTech platforms.

136.    Defendants had in their possession funds belonging to Plaintiffs and the Class.

137.    Defendants have not returned the funds belonging to Plaintiffs and the Class in full.

138.    Equity and justice require that Defendants be deemed to hold these funds in constructive trust for Plaintiffs and the Class.

139.    Plaintiffs and the Class are entitled to imposition of a constructive trust upon any accounts held by Defendants which contain funds belonging to Plaintiffs and the Class.

## EIGHTH CAUSE OF ACTION
### COMMON LAW FRAUD
### (Against the Evolve Defendants)

140.    Plaintiffs repeat and reallege the allegations set forth in paragraphs above as though fully set forth herein.

141.    Evolve Defendants made intentional representations of fact to Plaintiffs, members of the FDIC Representation Subclass, and the Class. Specifically:

a.    The real-time account balances of end users, viewable through the FinTech platforms, on a daily basis until May 11, 2024;

b.    Through monthly account statements provided to end users of FinTech platforms including Yotta and Juno, and upon information and belief other FinTechs utilizing

30

Evolve's banking services, Evolve represented that deposits were FDIC insured by stating: "Banking Services provided by…or Evolve Bank & Trust, Members FDIC." These representations were made on a monthly basis throughout the Class Period and were made by or on behalf of Evolve with Evolve's knowledge, approval, and at Evolve's direction.

c.  Through Evolve's publicly accessible website at getevolved.com, Evolve prominently represented that customer deposits were "FDIC Insured backed by the full faith and credit of the United States Government" on several pages, statements, and documents throughout the Class Period; and

d.  Through end user account interfaces and account settings pages on FinTech platforms including Yotta and Juno, and upon information and belief other FinTechs utilizing Evolve's banking services, Evolve represented itself as the designated "Bank Name" for customer accounts, thereby representing that customer deposits were held by an FDIC-insured institution and entitled to FDIC insurance protection.

142.  These FDIC insurance representations led Plaintiffs, members of the FDIC Representation Subclass, and the Class to believe their deposits were insured by the FDIC and protected against any loss up to $250,000 per depositor. Each named Plaintiff's total deposits were below the $250,000 FDIC insurance threshold. Plaintiffs and the FDIC Representation Subclass Members reasonably believed that, in the event of any disruption, their deposits would be protected by FDIC insurance as represented.

143.  These representations were false, or at minimum misleading. On information and belief: (a) the supposedly comprehensive continuous reporting of transactions was false as funds had secretly been misappropriated and/or mismanaged; (b) the account balances were false; (c)

there were serious compliance issues and risk management problems; (d) Evolve Defendants did not have the organizational and technical ability to safeguard user funds; (e) customer funds were not being swept to Program Banks as represented; and (f) the representations that customer deposits were FDIC insured were false because customer funds were maintained in pooled FBO accounts that did not comply with the pass-through insurance requirements of 12 C.F.R. § 330.5, in that Evolve failed to maintain records identifying each beneficial owner and their balance, failed to ensure beneficial owners were identifiable as having a legal right to the funds, and failed to properly notify customers of the arrangement and their actual insurance status.

144.    Evolve Defendants knew that their representations were false, material, and would be relied upon by Plaintiffs and the FDIC Representation Subclass in deciding to deposit and maintain funds with Evolve as a banking partner and trusted custodian of their money. Evolve Defendants knew no later than September 2023 that customer funds were missing, that Synapse's record-keeping was inaccurate, and that the record-keeping necessary to satisfy 12 C.F.R. § 330.5 was compromised—yet Evolve continued to represent through account statements, its website, and account interfaces that customer deposits were FDIC insured.

145.    Additionally, Evolve Defendants knew that Plaintiffs and the Class's deposited funds would not be covered against loss of the type at issue in this action, yet continued to misleadingly represent the funds as FDIC insured without clarification.

146.    Evolve omitted and failed to conspicuously disclose to Plaintiffs and the Class that their cash deposits were not protected from loss caused by mismanagement, misplacement, and/or fraud. Had Evolve disclosed those facts, Plaintiffs and the Class would have been aware of it and acted differently, including withdrawing their funds or refusing to deposit in the first instance.

32

147.    Plaintiffs and the FDIC Representation Subclass reasonably relied on these representations. Plaintiffs and Class Members would not have deposited funds with, or continued to custody their money at, Evolve absent the representations that their deposits were FDIC insured. The FDIC insurance representation was a material factor in Plaintiffs' and Class Members' decisions to entrust their funds to Evolve.

148.    Plaintiffs have been damaged by Evolve Defendants' false representations in an amount to be proven at trial, including unpaid principal with interest. Members of the FDIC Representation Subclass have been additionally damaged in that they were deprived of the FDIC insurance protection they were promised, and their deposits were exposed to loss without the safeguard that induced them to deposit funds with Evolve in the first instance.

149.    Evolve Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiffs, entitling Plaintiffs to punitive damages.

### NINTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
### (Against the Evolve Defendants)

150.    Plaintiffs repeat and reallege the allegations set forth in paragraphs above as though fully set forth herein.

151.    Plaintiffs plead this claim in the alternative to their common law fraud claim.

152.    Evolve Defendants made negligent representations of fact to Plaintiffs, members of the FDIC Representation Subclass, and the Class. Specifically:

    a. The real-time account balances of end users, viewable through the FinTech platforms, on a daily basis until May 11, 2024;

b.  Through monthly account statements provided to end users of FinTech platforms including Yotta and Juno, and upon information and belief other FinTechs utilizing Evolve's banking services, Evolve represented that deposits were FDIC insured by stating: "Banking Services provided by…or Evolve Bank & Trust, Members FDIC." These representations were made on a monthly basis throughout the Class Period and were made by or on behalf of Evolve with Evolve's knowledge, approval, and at Evolve's direction.

c.  Through Evolve's publicly accessible website at getevolved.com, Evolve prominently represented that customer deposits were "FDIC Insured backed by the full faith and credit of the United States Government" on several pages, statements, and documents throughout the Class Period; and

d.  Through end user account interfaces and account settings pages on FinTech platforms including Yotta and Juno, and upon information and belief other FinTechs utilizing Evolve's banking services, Evolve represented itself as the designated "Bank Name" for customer accounts, thereby representing that customer deposits were held by an FDIC-insured institution and entitled to FDIC insurance protection.

153.    These FDIC insurance representations led Plaintiffs, members of the FDIC Representation Subclass, and the Class to believe their deposits were insured by the FDIC and protected against any loss up to $250,000 per depositor. Each named Plaintiff's total deposits were below the $250,000 FDIC insurance threshold. Plaintiffs and the FDIC Representation Subclass Members reasonably believed that, in the event of any disruption, their deposits would be fully protected by FDIC insurance as represented.

34

154.     These representations were false, or at minimum misleading. On information and belief: (a) the supposedly comprehensive continuous reporting of transactions was false as funds had secretly been misappropriated and/or mismanaged; (b) the account balances were false; (c) there were serious compliance issues and risk management problems; (d) Evolve Defendants did not have the organizational and technical infrastructure to track and safeguard user funds; (e) customer funds were not being swept to Program Banks as represented; and (f) the representations that customer deposits were FDIC insured were false because customer funds were maintained in pooled FBO accounts that did not comply with the pass-through insurance requirements of 12 C.F.R. § 330.5, in that Evolve failed to maintain records identifying each beneficial owner and their balance, failed to ensure beneficial owners were identifiable as having a legal right to the funds, and failed to properly notify customers of the arrangement and their actual insurance status.

155.     Evolve Defendants lacked reasonable grounds for believing that their representations were true and failed to exercise reasonable care in ascertaining whether the representations were accurate. Evolve Defendants knew that their representations would be relied upon by Plaintiffs and the FDIC Representation Subclass in deciding to deposit and maintain funds with Evolve as a banking partner and trusted custodian of their money. Evolve Defendants knew or should have known no later than September 2023 that customer funds were missing, that Synapse's record-keeping was inaccurate, and that the record-keeping necessary to satisfy 12 C.F.R. § 330.5 was compromised—yet Evolve continued to represent through account statements, its website, and account interfaces that customer deposits were FDIC insured.

156.     Additionally, Evolve Defendants knew or should have known that Plaintiffs and the Class's deposited funds would not be covered against loss of the type at issue in this action, yet continued to misleadingly represent the funds as FDIC insured without clarification.

35

157. Evolve omitted and failed to conspicuously disclose to Plaintiffs and the Class that their cash deposits were not protected from loss caused by mismanagement, misplacement, and/or fraud. Had Evolve disclosed those facts, Plaintiffs and the Class would have been aware of it and acted differently, including withdrawing their funds or refusing to deposit in the first instance.

158. Plaintiffs and the FDIC Representation Subclass reasonably relied on these representations. Plaintiffs and Class Members would not have deposited funds with, or continued to custody their money at, Evolve absent the representations that their deposits were FDIC insured. The FDIC insurance representation was a material factor in Plaintiffs' and Class Members' decisions to entrust their funds to Evolve.

159. Plaintiffs have been damaged by Evolve Defendants' false representations in an amount to be proven at trial, including unpaid principal with interest. Members of the FDIC Representation Subclass have been additionally damaged in that they were deprived of the FDIC insurance protection they were promised, and their deposits were exposed to loss without the safeguard that induced them to deposit funds with Evolve in the first instance.

## TENTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA PENAL CODE § 496
#### (Against Defendants)

160. Plaintiffs reallege and incorporate by reference the matters alleged in the foregoing paragraphs as if fully set forth herein.

161. On information and belief, certain Plaintiffs and Class Members made deposits with Defendants, via the FinTechs, in accounts domiciled in California. Specifically, Synapse Financial Technologies, Inc., headquartered in San Francisco, California, created, opened, configured, and administered the underlying account structures from its California headquarters. The FinTech platforms Yotta and Juno, through which numerous Plaintiffs and Class Members enrolled and

deposited funds, operated their banking platform infrastructure in connection with Synapse from California. On information and belief, the accounts of at least some Plaintiffs and Class Members who enrolled through Yotta, Juno, and other California-based FinTechs were created and maintained in California, subjecting the conduct at issue to California Penal Code § 496.

162.    At minimum, Cal. Penal Code § 496 applies to California Plaintiffs Claxton, Yeh, and other end users residing in California.

163.    Pursuant to Cal. Penal Code § 496, Defendants knowingly withheld property from end users who were the rightful owners of their cash funds.

164.    Plaintiffs and Class Members' property was obtained under false pretenses constituting theft. Plaintiffs and Class Members believed their funds were safely deposited, protected from any type of loss, and fully insured. Plaintiffs and Class Members would not have deposited their funds with Defendants, and would have promptly withdrew their funds, had they known that the Synapse ledger was materially inaccurate or could be materially inaccurate, that Defendants did not maintain their own independent ledgers to track and safeguard the funds, that the funds may not be available for withdrawal within a reasonable time, or that the funds were not protected from the loss at issue in this action.

165.    On information and belief, Defendants' conduct was knowing. As explained above, on information and belief, Defendants knew Plaintiffs and the Class would be injured by the withholding of customer funds, knew Synapse was having problems before further amounts were dissipated, knew that Plaintiffs and the Class expected their funds would be safeguarded, available for withdrawal, and protected from all loss, knowingly failed to conduct adequate auditing and reconciliation, and turned a blind eye to rampant misconduct.

166. As a result, Plaintiffs and the Class have suffered damages in an amount to be established at trial, plus trebled damages and attorney's fees.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully prays for following relief:

a. Certification of this case as a class action on behalf of the proposed Class and any subclasses defined above, appointment of Plaintiffs as Class representatives, and appointment of their counsel as Class Counsel;

b. An award to Plaintiffs and the proposed Class and subclasses of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement;

c. An injunction ordering Defendants to cease the business practices complained of herein;

d. An injunction and declaration barring Evolve and Bancorp from being a custodian of customers' funds;

e. An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendants' conduct;

f. An award of nominal, punitive, exemplary, trebled, and statutory damages where available;

g. Reasonable expenses and attorneys' fees;

h. Appointment of a receiver, custodian, or trustee;

i. Provide an accounting as to all the amounts owed to the Class;

j. Provide an accounting as to all outstanding custodial obligations, liabilities, and assets;

k.  Pre- and post-judgment interest, to the extent allowable; and

l.  For such further relief that the Court may deem just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the proposed Class, demand a trial by jury of all

claims so triable.

Dated: March 2, 2026

/s/ *M. Anderson Berry*
M. Anderson Berry
**EMERY REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: 916-823-6955
*anderson@emeryreddy.com*

Gary M. Klinger
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone:  (866) 252-0878
*gklinger@milberg.com*

J. Gerard Stranch, IV
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
*gstranch@stranchlaw.com*

*Interim Co-Lead Counsel*

Blake J. Lindemann
**LINDEMANN LAW FIRM, APC**
9777 Wilshire Boulevard, 4th Floor
Beverly Hills, CA 90212
Telephone: 310.279.5269
Facsimile:  310.300.0267
*Blake@lawbl.com*

Alexander E. Wolf
**MILBERG, PLLC**
280 South Beverly Hills Drive, Penthouse
Beverly Hills, CA 90212
Telephone: (872) 365-7060
*awolf@milberg.com*

Jeff Ostrow
Steven Sukert
**KOPELITZ OSTROW P.A.**
One West Law Olas Boulevard. Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 332-4200
*ostrow@kolawyers.com*
*sukert@kolawyers.com*

Timothy W. Emery
**EMERY REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: 206-442-9106
*emeryt@emeryreddy.com*

Terence R. Coates
Dylan J. Gould
**MARKOVITS, STOCK & DEMARCO LLC**
119 East Court Street, Suite 350
Cincinnati, OH 45202
Telephone: (513) 651-3700
*tcoates@msdlegal.com*
*dgould@msdlegal.com*

Andrew J. Shamis
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299
*ashamis@shamisgentile.com*

Brian Levin
**LEVIN LAW, P.A.**
2665 South Bayshore Drive, PH2B
Miami, Florida 33133
Mobile: (305) 613-0318
Telephone (Bloomfield Hills): (248) 270-7338
*Brian@levinlawpa.com*

Adam Schwartzbaum
**EDELSBERG LAW, P.A.**
20900 NE 30th Avenue, Suite 417
Aventura, FL 33180
Telephone: 786-289-2643
*adam@edelsberglaw.com*

*Additional Attorneys for Plaintiffs*

40